**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BOUBACAR GARBA,** | : | Civil No. 1:13-CV-2497 |
| | : | |
| **Plaintiff,** | : | |
| | : | ( Judge Kane) |
| vs. | : | |
| | : | (Magistrate Judge Carlson) |
| **FRESH EXPRESS, INC.,** | : | |
| | : | |
| **Defendants** | : | |

**REPORT AND RECOMMENDATION**

I.   **Introduction**

Contractual disputes often entail divining the intent of the parties. In many instances this task reduces itself to an exercise in determining whether the parties genuinely failed to have a meeting of the minds, or whether one party, with the clarity of hindsight, simply wishes to escape what he now regards as an inconvenient promise.

So it is in this case. This matter comes before us on a motion to enforce a settlement agreement filed by the defendant. (Doc. 19.) Upon consideration of this motion, and after conducting a hearing in this matter, we conclude that an enforceable agreement does exist between these parties to settle this case for $7,000. While the plaintiff may now, in hindsight, experience buyer's remorse relating to the promise

he made and conveyed through his counsel, those regrets do not justify allowing the plaintiff to ignore his promises simply because they are no longer convenient. Therefore, for the reasons set forth below, we recommend that the motion to enforce settlement agreement be granted.

## II. Statement of Facts and of The Case

This settlement dispute arises out of an employment discrimination case filed by the plaintiff, Boubacar Garba, against his former employer, Fresh Express, Inc. With respect to the question of whether the parties reached an enforceable agreement to settle this lawsuit, all counsel have submitted affidavits describing their settlement discussion. These affidavits are consistent and congruent with one another, and describe a commonplace course of settlement negotiations, negotiations that led to an agreed-upon resolution of this case. (Docs. 20-3, and 23.)

According to counsel, these settlement negotiations took place in May and June of 2014, following the plaintiff's May 20, 2014, deposition in this lawsuit. According to the plaintiff's counsel,[1] prior to May 29, 2014, the plaintiff, Boubacar Garba, had authorized his counsel to settle this case for $14,500. Following Garba's deposition,

---

[1] The plaintiff was represented in this case by two experienced counsel, Samuel Dion, Esq., and Richard Bateman, Esq. Both counsel have provided affidavits detailing their communications with the plaintiff regarding this settlement. (Doc.23.)

on June 4, 2014, Mr. Dion and Mr. Bateman had an extensive telephone conversation with Garba during which they discussed the "pros and cons of his case."[2] In light of their assessment of his case, both Mr. Dion and Mr. Bateman sought authorization from Garba to attempt to negotiate a settlement of this lawsuit. At the conclusion of the June 4, 2014, telephone conversation Attorneys Dion and Bateman both understood that Garba had authorized them to settle this case for $4,000 or more.[3]

Attorney Bateman then took the lead in these settlement discussions. In the course of these negotiations, on June 12, 2014, Mr. Bateman and Garba had a telephone conversation in which Mr. Bateman sought confirming authorization to settle this case for $7,000, some $3,000 more than the settlement sum that the attorney believed Garba had previously authorized on June 4, 2014. According to Attorney Bateman at the close of this discussion he asked Garba for authorization to

---

[2] In his testimony at a hearing conducted before the Court on August 29, 2014, Garba described this telephone conversation and indicated that both counsel shared with the plaintiff their candid assessment that his case had little likelihood of success in the wake of Garba's deposition.

[3] For his part, Garba submitted an affidavit in which he swore that the attorneys sought authorization to settle the case for a certain sum on June 4. Garba also acknowledged that the lawyers believed that he had authorized a sum certain settlement of $4,000 or more. However, Garba's declaration, his first statement under oath regarding this settlement process, simply and enigmatically stated that "I gave them authority to settle my case at that time for no less than a certain sum" without ever stating what that "certain sum" was.

enter into a $7,000 settlement and Garba replied: "Ok Richard, whatever you think."

Having received what he believed to be this authority to settle this case for $7,000 counsel reached an agreement to settle this lawsuit for that sum. Plaintiff's counsel then communicated this settlement by voice-mail to Garba on June 12, 2014. When counsel did not hear back from Garba after a week had passed they placed follow-up calls to the plaintiff on June 19, 2014, and ultimately both of plaintiff's counsel spoke with Garba by telephone on June 20, 2014. According to Garba's two attorneys, by June 20, 2014, Garba reported to his attorneys that he now refused to accept the $7,000 settlement they had negotiated on his behalf because it was not enough money to compensate him for his damages.

In stark contrast to the straightforward factual narrative provided by his own counsel, Boubacar Garba initially provided the Court with an affidavit which set forth an inconsistent and contradictory account of these settlement negotiations. Thus, Garba acknowledged initially demanding $14,500 to settle this case in May 2014. (Doc. 23, Garba affidavit, ¶3.) Garba then conceded that his attorneys sought authorization to settle the case for a certain sum on June 4, 2014, and admitted that his lawyers believed that he had authorized a sum certain settlement of $4,000 or more. However, in his declaration Garba enigmatically stated that "I gave them authority to settle my case at that time for no less than a certain sum" without ever

stating what that "certain sum" was. (Id., ¶4.) Garba's initial declaration then entirely ignored his June 12, 2014, conversation with Attorney Bateman in which Mr. Bateman stated that Garba authorized a $7,000 settlement of the case. (Id.) Instead, Garba's declaration implied that he first learned of this $7,000 settlement amount on June 20, 2014, and rejected that settlement amount at that time. (Id., ¶5.) Garba then provided a mathematically contradictory account of his version of these settlement discussions, stating that he believed he had only authorized a $14,000 settlement, and that he had understood the settlement to have been for $17,000. (Id., ¶6.) Oddly, Garba's declaration immediately contradicted these representations regarding his settlement posture. Having stated that he authorized the lawyers to settle the case for $14,000 Garba announced in his swore declaration that "$17,000 is not enough to settle..." (Id.,¶6) and "for even $20,000 I will not settle this case.' (Id., ¶9.) Thus, in the course of a brief 3-page sworn declaration Garba admitted to authorizing a settlement for an undisclosed sum certain that he acknowledged his lawyers believed to be $4,000; Garba then denied actually authorizing $4,000 or $7,000 settlements; further, Garba seemed to acknowledge authorizing a $14,500 settlement; and then contradicted that claim of authorization by stating that he would not settle for $20,000.

Given the inconsistences which riddled Garba's account of these events, as a matter of fairness to the plaintiff we scheduled a hearing in this matter on August 29, 2014, to allow Garba to testify and provide some clarity to the many contradictions in his prior affidavit.  Having conducted this hearing, we find that Garba's account of these negotiations remains evasive, elusive, contradictory and inconsistent. Further, we find that Garba's claims that he did not authorize a settlement of this matter for $4,000 or $7,000 is contradicted by the great weight of the credible evidence in this matter, including admissions made by Garba before this Court.

In his hearing testimony, Garba addressed the one critical factual issue which he had evaded in his initial sworn declaration, the nature of his June 12, 2014, conversation with his own attorney, Richard Bateman.  After some equivocation, Garba conceded that Attorney Bateman's description of this June 12, 2014, conversation–in which Attorney Bateman alleged that he asked Garba for authorization to enter into a $7,000 settlement and Garba replied:  "Ok Richard, whatever you think"– was accurate.  After making this significant concession, the balance of Garba's hearing testimony was a wholly unpersuasive fabric of explanations for his erratic conduct, explanations which failed legally, logically, linguistically and mathematically.  Thus, at various times Garba suggested that he believed that his lawyers were describing $14,000 and $17,000 settlement figures

6

when they actually stated $4,000 and $7,000. Garba then seemed to contradict this assertion by acknowledging that at times the lawyers spoke of $4,000 and $7,000 settlements. Garba tried to reconcile these inconsistencies by then insisting that he believed these $4,000 and $7,000 sums were in addition to his initial $14,500 demand. However, Garba did not, and could not, explain how these additional sums could have added up to the $17,000 settlement sum which he claimed he understood that the defendants had offered him, since plainly they do not.[4] Finally, presented with the many inherent contradictions in his testimony, Garba asserted in an incredible fashion that he instructed his lawyers to settle the case but never told them what sum he would accept in settlement of his claims.

On these facts, we find that the defendant has carried its burden of proving the existence of an enforceable settlement agreement involving a $7,000 settlement, and Garba authorized such a settlement on June 12, 2014, during a conversation with Attorney Bateman. We further find that Garba's later objections to this settlement amount do not stem from a genuine misunderstanding or a failure of the parties to

---

[4]Garba initially claimed that he demanded $14,500. If Garba actually believed that his lawyers' discussion of $4,000 and $7,000 settlements represented some additional sum of money beyond his demand, then the total settlement should have been either $18,500 or $21,500. However, arithmetically that settlement total would never equal the $17,000 figure that Garba alluded to in his declaration.

reach a meeting of the minds. Instead, it reflects a legally unenforceable human desire to avoid compliance with an inconvenient promise. Therefore, it is recommended that the motion to enforce be granted.

### III. Discussion

The legal principles which govern enforcement of settlement agreements are familiar and well-settled. At the outset, Fresh Express, Inc., "as the party seeking to enforce a purportedly valid settlement agreement, bears the burden of proving that [Garba] granted the authority to enter into the agreement to his attorney. See Mowrer v. Warner–Lambert Co., 2000 WL 974394, at *5 (E.D.Pa. July 13, 2000)." Pisarz v. PPL Corp., 4:10-CV-01432, 2014 WL 220778 (M.D. Pa. Jan. 21, 2014).

In deciding whether Fresh Express has carried this burden of proof and persuasion, we are reminded that "settlement agreements are essentially contracts to which the basic contract principles apply. Williams v. Metzler, 132 F.3d 937, 946 (3d Cir.1997); and see Cal. Sun Tanning USA v. Electric Beach, Inc., 369 Fed. Appx. 340, 346 at n. 6 (3d Cir.2010). The essential elements of a contract are an offer, acceptance, and consideration or a mutual meeting of the minds. Richter v. Pfundt, 2009 WL 5064383 (E.D.Pa.) (citing Yarnall v. Almy, 703 A.2d 535, 538 (Pa.Super.1997) (citations omitted))." Riviello v. First Nat. Cmty. Bank, CIV.A. 3:10-2347, 2013 WL 1348259 (M.D. Pa. Apr. 3, 2013). Therefore "[a] settlement

8

agreement is binding once the parties express mutual assent to its terms and conditions, see Main Line Theatres, Inc. v. Paramount Film Distrib. Corp., 298 F.2d 801, 802 & n. 1 (3d Cir.1962), and need not be reduced to writing to be enforceable. See Green v. John H. Lewis & Co., 436 F.2d 389, 390 (3d Cir.1970) (per curiam)." Kelly v. Boeing, Inc., 513 F. App'x 131, 134 (3d Cir. 2013).

In sum:

In Pennsylvania, one party may enforce and legally bind another party with oral agreement. Kazanjian v. New England Petroleum Corp., 332 Pa.Super. 1, 480 A.2d 1153, 1157 (Pa.Super.Ct.1984). "Moreover, it is well-settled in Pennsylvania that where the parties have settled upon the essential terms and the only remaining act to be done is the formalization of the agreement, the latter is not inconsistent with the present contract." Melo–Sonics Corp. v. Cropp, 342 F.2d 856, 859–60 (3d Cir.1965); accord Main Line Theaters, Inc. v. Paramount Film Distrib. Corp., 298 F.2d 801, 803 (3d Cir.), cert. denied, 370 U.S. 939, 82 S.Ct. 1585, 8 L.Ed.2d 807 (1962); Compu Forms Control, Inc. v. Altus Group, Inc., 393 Pa.Super. 294, 574 A.2d 618, 623 (Pa.Super.Ct.1990) (citing Woodbridge v. Hall, 366 Pa. 46, 76 A.2d 205 (Pa.1950). Furthermore, " '[a]n agreement to settle a lawsuit, voluntarily entered into, is binding upon the parties, whether or not made in the presence of the court, and even in the absence of a writing.' " Gross v. Penn Mut. Life Ins. Co., 396 F.Supp. 373, 374 (E.D.Pa.1975) (quoting Green v. John H. Lewis & Co., 436 F.2d 389, 390 (3d Cir.1970)).

Frank v. Nostalgia Network, Inc., CIV. A. 96-2921, 1997 WL 44845 (E.D. Pa. Jan. 30, 1997).

Further, when deciding whether counsel had the authority to enter into a settlement agreement on behalf of a client, "it is 'clear and well-settled that an

attorney must have express authority in order to bind a client to a settlement agreement.' Reutzel v. Douglas, 582 Pa. 149, 870 A.2d 787, 789–90 (2005). 'Express authority' empowering an attorney to settle a client's claim 'must be the result of explicit instructions regarding settlement.' Tiernan v. Devoe, 923 F.2d 1024, 1033 (3d Cir.1991)." Pisarz v. PPL Corp., 4:10-CV-01432, 2014 WL 220778, *1 (M.D. Pa. Jan. 21, 2014). "Further, although Pennsylvania's rule requiring attorneys to obtain express settlement authority is intended to ensure that clients do not 'forfeit substantial legal rights' unknowingly, Reutzel, 870 A.2d at 790, attorneys are not expected to be telepathists or even infallible interpreters of clients's verbalized communications. An attorney is, rather, expressly authorized to settle a client's case 'if he is reasonable in drawing an inference that the [client] intended him so to act although that was not the [client's] intent.' Restatement (Second) of Agency § 7 cmt. b." Pisarz v. PPL Corp., 4:10-CV-01432, 2014 WL 220778, *4 (M.D. Pa. Jan. 21, 2014).

Applying these legal guideposts we find that the great weight of the evidence shows that on June 4, 2014, following the plaintiff's deposition, Attorneys Dion and Bateman spoke with Garba by telephone, advised him of the poor prospects for success in this litigation, and sought authorization to settle the case. Moreover, the great weight of the credible evidence reveals that at the close of this discussion both Attorney Dion and Attorney Bateman reasonably understood that Garba had

authorized them to settle this case for $4,000 or more. Acting upon this authorization over the next several days Attorney Bateman negotiated a $7,000 settlement for Garba, a sum that was $3,000 in excess of the minimum settlement threshold previously authorized by Garba on June 4, 2014, in a conversation with both of his counsel.

Attorney Bateman then separately discussed this $7,000 settlement with Garba on June 12, 2014. As to this conversation, Bateman and Garba both acknowledged that Attorney Bateman's description of this conversation–in which Attorney Bateman alleged that he asked Garba for authorization to enter into a $7,000 settlement and Garba replied: "Ok Richard, whatever you think"– was accurate. This statement by Garba was, and reasonably could be construed as, an express authorization to settle the litigation for $7,000. Armed with this express authorization, the parties then entered into an oral, and enforceable, settlement agreement, which was reported to Garba in a telephone message by Attorney Bateman on June 12, 2014.

Eight days then elapsed without a response from Garba. This fact is strongly suggestive of buyer's remorse on Garba's part rather than any confusion regarding the terms of a settlement. Indeed, if Garba had not authorized a $7,000 settlement in his conversation with Attorney Bateman on June 12, 2014, one would have expected that he would have immediately contacted Bateman to object to that settlement when

Bateman left a telephone message reporting the settlement later on the day of June 12, 2014. Instead, Garba took no action and expressed no opinion to his own counsel for more than a week until his two counsel were able to reach the plaintiff by telephone on June 20, 2014. At that time both of Garba's counsel reported that Garba's initial reason for rejection of this $7,000 settlement was consistent with buyer's remorse and a reluctance to follow through on an inconvenient promise previously made by the plaintiff. Thus, both counsel reported that Garba's initial, fundamental objection was that he refused to "accept the settlement because it was not enough money." (Doc. 23, affs. Dion and Bateman.)

In the face of this evidence, Garba has provided an account of events which is contradictory, and wholly unpersuasive. While Garba acknowledges that his lawyers were seeking authorization to settle for a sum certain, and admits that Attorney Bateman accurately described the content of their June 12, 2014, conversation in which Bateman received what can reasonably be construed as authorization to settle this litigation for $7,000, Garba implausibly claims that he never provided his counsel with any settlement figure which he would deem acceptable. This assertion is incredible and would require the Court to believe that experienced counsel engaged in weeks of settlement negotiations without any meaningful guidance or input from their client. In essence, we would have to accept that Garba successfully insisted that

both his own lawyers and counsel for Fresh Express engage in some peculiar form of blind bidding, where they would simply propose various settlement terms to the plaintiff until Garba was ready to announce himself satisfied.

Settlement negotiations simply are not the type of Delphic bidding process Garba describes, where his own lawyers and opposing counsel are instructed to keep guessing regarding the terms of a settlement until the plaintiff pronounces himself pleased. The incredible nature of Garba's description of this process substantially undermines the plaintiff's credibility in this case. Garba's description of this settlement process is incredible in a number of other respects as well. For example, in his affidavit Garba claims to have initially authorized a $14,500 settlement, but later asserted that he would not settle this case for $20,000. Thus, if we are to believe Garba's own account, in the course of these negotiations the plaintiff authorized a settlement amount that he secretly knew he would later reject. This is a damning admission for the plaintiff since it is clear that Garba's "attorneys are not expected to be telepathists or even infallible interpreters of clients's verbalized communications. An attorney is, rather, expressly authorized to settle a client's case 'if he is reasonable in drawing an inference that the [client] intended him so to act although that was not the [client's] intent.' Restatement (Second) of Agency § 7 cmt. b." Pisarz v. PPL Corp., 4:10-CV-01432, 2014 WL 220778, *4 (M.D. Pa. Jan. 21, 2014). Finally,

Garba has also provided conflicting and contradictory accounts of the negotiations, accounts which cannot be reconciled phonetically or mathematically with the objective realities of these settlement discussions. Given these inconsistencies, we are compelled to reject Garba's account that he never authorized settlement of this lawsuit.[5]

Instead, we find that Fresh Express has shown by clear and convincing evidence that the plaintiff authorized his counsel to settle this litigation for $4,000 and $7,000. We further find that, acting upon Garba's instructions, his counsel reached an enforceable agreement to settle this lawsuit for $7,000, and that Garba's subsequent repudiation of that agreement reflects Garba's belated, but legally unenforceable, desire to avoid compliance with an inconvenient promise. Therefore, it is recommended that the motion to enforce this settlement be granted.

## IV. Recommendation

For the reasons set forth above, it is RECOMMENDED that the Court GRANT the defendant's Motion to Enforce Settlement Agreement. (Doc. 19.)

---

[5]Having observed Garba's demeanor as he testified, we also discount any claim that the inconsistencies in Garba's accounts are solely a result of linguistic barriers between the plaintiff and his attorneys. While there may be some language barriers for the plaintiff, we found that the significant contradictions in Garba's various statements were not the innocent product of linguistic confusion but rather resulted from an unsuccessful effort by the plaintiff to stitch together his own conflicting accounts of his actions into a coherent whole.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 3d day of September, 2014.

                                      *S/Martin C. Carlson*
                                      Martin C. Carlson
                                      United States Magistrate Judge